**Slip Op. 11-3**

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNION STEEL, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | **Before:  Timothy C. Stanceu, Judge** |
| Defendant, | **Court No. 08-00101** |
| and | |
| UNITED STATES STEEL CORPORATION and NUCOR CORPORATION, | |
| Defendant-Intervenors. | |

### OPINION AND ORDER

[Holding contrary to law the decision of the United States Department of Commerce made on remand to retain the existing model-match methodology and ordering a second remand]

Dated: January 11, 2011

*Troutman Sanders LLP* (*Donald B. Cameron*, *Brady W. Mills*, *Julie C. Mendoza*, and *R. Will Planert*) for plaintiff.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson,* Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Claudia Burke*); *Jonathan Zielinski* and *Daniel J. Calhoun*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

*Skadden Arps Slate Meagher & Flom, LLP* (*Ellen J. Schneider*, *Jeffrey D. Gerrish*, *Jared R. Wessel*, *John J. Mangan*, and *Robert E. Lighthizer*) for defendant-intervenor United States Steel Corporation.

*Wiley Rein, LLP* (*Timothy C. Brightbill*, *Alan H. Price*, and *Robert E. DeFrancesco, III*) for defendant-intervenor Nucor Corporation.

Stanceu, Judge: Plaintiff Union Steel Manufacturing Co., Ltd. ("Union") brought this action to contest a final determination ("Final Results") issued by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), in the thirteenth administrative review of an antidumping duty order on imports of certain corrosion-resistant carbon steel flat ("CORE") products from the Republic of Korea ("Korea"). *See Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Thirteenth Admin. Review*, 73 Fed. Reg. 14,220 (Mar. 17, 2008) ("*Final Results*"). Previously, the court denied relief on one of plaintiff's claims, which challenged the Department's construction of section 771(35) of the Tariff Act of 1930, 19 U.S.C. § 1677(35) (2006), to allow application of "zeroing," *i.e.*, the deeming of the sales a respondent makes in the United States at prices above normal value to have individual dumping margins of zero rather than negative margins. *Union Steel v. United States*, 33 CIT __, __, 645 F. Supp. 2d 1298, 1300 (2009). At the same time, the court granted defendant's request for a voluntary remand on the issue raised by plaintiff's other claim in this case, which contested the application of Commerce's "model-match" methodology in the thirteenth review. *Id.* at __, 645 F. Supp. 2d at 1309-10. In this second claim, Union challenged Commerce's model-match methodology, under which Commerce compared Union's U.S. sales of painted CORE products to Union's home market sales, which included not only painted CORE products but also "laminated" CORE products, *i.e.*, CORE products coated with a plastic film made of polyethylene terephthalate ("PET") or polyvinyl chloride ("PVC"). Br. in Supp. of the Mot. of Pl. Union Steel for J. Upon the Agency R. 3 ("Pl.'s Br."). In making that comparison, the model-match methodology relied

on the definition of "foreign like product" in section 771(16)(A) of the Tariff Act of 1930, under

which merchandise may be compared if it is "identical in physical characteristics."  19 U.S.C.

§ 1677(16)(A).

 Before the court is the redetermination the Department issued in response to the court's

remand order ("Remand Redetermination"), in which Commerce decided to leave unchanged its

model-match methodology.  *Final Results of Redetermination Pursuant to Remand* (Dec. 28,

2009) ("*Remand Redetermination*").  Plaintiff raises various arguments in opposition to the

Remand Redetermination, which defendant-intervenors urge the court to affirm.  *See* Pl. Union

Steel's Comments on Def. United States' Final Results of Redetermination Pursuant to Remand

("Pl.'s Comments"); United States Steel Corp.'s Comments on the Final Redetermination

Pursuant to Ct. Remand Issued by the Department of Commerce ("U.S. Steel's Remand

Comments"); Nucor Corp.'s Comments on Remand Results.  Because the record lacks

substantial evidence to support a finding that the physical differences distinguishing the

laminated CORE products from the CORE products the Department compared to the laminated

CORE products are minor and commercially insignificant, the court sets the Remand

Redetermination aside as contrary to law and orders Commerce to issue a second remand

redetermination in accordance with this Opinion and Order.

## I. Background

 The background of this case is set forth in the court's previous opinion and is

supplemented herein.  *See Union Steel*, 33 CIT at __, 645 F. Supp. 2d at 1300-02.

 Rejecting a proposal by Union, Commerce, in the Final Results and again in the Remand

Redetermination, declined to adopt a separate model-match type category for CORE products

that were coated with a plastic film. *Remand Redetermination* 5-6. Union had sales of such

laminated products in Korea during the period of review (from August 1, 2005 to July 31, 2006)

but had no sales of its laminated CORE products in the United States during that period. Pl.'s

Br. 3. In support of its proposed type category for laminated products, Union argued that its

laminated products underwent a different production process than its painted products, were

physically different from its painted products because they were coated with a plastic film, and

were costlier than its painted products. *Id.* at 3-7.

As it had in the Final Results, Commerce, in the Remand Redetermination, grouped the

home market sales of products Union had sought to have categorized as laminated products

within the type category of "All Other" painted products. *Remand Redetermination* 1; *see* Issues

& Decisions Mem., A-580-816, ARP 3-08, at 14-15 (Mar. 10, 2008) (Admin. R. Doc. No. 4563),

*available at* http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/E8-5298-1.pdf ("*Decision*

*Mem.*"); *Final Results*, 73 Fed. Reg. at 14,221 (incorporating by reference the *Decision Mem.*).

Rejecting the need to change its model-match methodology, Commerce on remand made no

change in the final antidumping duty margin of 4.35% that Commerce assigned to Union in the

Final Results, *Final Results*, 73 Fed. Reg. at 14,221, stating that "[i]n accordance with the

Court's instructions, the Department has reviewed and reconsidered information on the record to

determine whether on remand to revise its model-match methodology to include a separate

category for laminated products as advocated by respondent Union Steel." *Remand*

*Redetermination* 1. The Remand Redetermination states that "the Department finds that record

evidence does not support revising its model-match methodology with respect to laminated

products." *Id.*

Upon plaintiff's motion, the court held oral argument on the Remand Redetermination on July 16, 2010.  The parties since have made post-argument submissions.  Pl. Union Steel's Post-Oral Argument Comments on Commerce's Remand Redetermination ("Pl.'s Post-Oral Argument Comments"); Def.'s Resp. to Pl.'s Post-Oral Argument Comments on Commerce's Remand Redetermination ("Def.'s Post-Oral Argument Resp."); Nucor Corp.'s Post-Oral Argument Resp. Comments ("Nucor's Post-Oral Argument Comments"); U.S. Steel Corp.'s Resp. to Pl. Union Steel's Post-Oral Argument Comments ("U.S. Steel's Post-Oral Argument Resp.").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a, including an action contesting the final results of an administrative review that Commerce issues under section 751 of the Tariff Act of 1930, 19 U.S.C. § 1675(a).  The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In the Remand Redetermination, Commerce explained that its model-match type categories, as developed during the investigation and first administrative review, resulted from a determination "that CORE products should be separated into four categories: clad, unpainted, painted, and painted with polyvinylidene fluoride (PVDF)." *Remand Redetermination* 1. Commerce also explained that during the development of these four categories, certain parties

requested that the Department create an additional category for laminated products, that the

Department did not do so at the time, and that the Department decided instead to group

laminated products with painted products for model-match purposes. *Id.* at 2. During the review

at issue in this case, Commerce rejected Union's proposal to place laminated CORE products in

a separate type category instead of combining laminated products with the "other painted"

products, *i.e.*, the painted CORE products other than CORE products that are painted with

PVDF. *Decision Mem.* 14-15.

In an administrative review, Commerce is required generally to determine the normal

value, the export price or constructed export price, and the dumping margin for each entry of the

subject merchandise. 19 U.S.C. § 1675(a)(2). Determining a dumping margin requires

Commerce to compare the export price or constructed export price with the normal value, which

as a general matter is determined according to the price at which the foreign like product is sold

for consumption in the exporting country (the "home market"). 19 U.S.C. § 1677b(a)(1)(B). For

this comparison, Commerce, in accordance with the statutory definition of "foreign like product"

set forth in 19 U.S.C. § 1677(16)(A), first attempts to match subject merchandise with

merchandise "which is *identical* in physical characteristics with, and was produced in the same

country by the same person as, that merchandise." *See id.* § 1677(16)(A) (emphasis added).

Only if "a determination for the purposes of part II of this subtitle," which part is labeled

"Imposition of Antidumping Duties," cannot "be satisfactorily made" does Commerce, in

accordance with § 1677(16)(B), seek to match the subject merchandise with merchandise

produced in the same country and by the same person that is "*like* that merchandise in

component material or materials and in the purposes for which used." *Id.* § 1677(16)(B)

(emphasis added).  If the latter determination cannot be satisfactorily made under § 1677(16)(B),

Commerce is to consider, under § 1677(16)(C), whether merchandise produced in the same

country and by the same person that is "of the same general class or kind as the subject

merchandise" and "like that merchandise in the purposes for which used" may reasonably be

compared with the subject merchandise.  *Id.* § 1677(16)(C).

On remand, in again rejecting Union's proposal and thereby treating Union's laminated

CORE products as "other painted" CORE products, the Department applied the "like product"

definition of subparagraph (A) of § 1677(16).  *See Remand Redetermination* 3-6.  Although the

Remand Redetermination does not state this point clearly, it includes text accompanied by a case

citation with a parenthetical, as follows:

> Thus, the Department has considerable discretion in interpreting the statute and developing
> an appropriate model-match methodology.  *See Pesquera Mares Australes Ltda. v. United
> States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001) (noting with respect to the subsection of
> 1677(16) applicable in this case, *subsection (A)*, that "Commerce has considerable
> discretion in defining 'identical in physical characteristics.'").

*Id.* at 3 (emphasis added).  Defendant's counsel, Ms. Claudia Burke, confirmed at oral argument

that the Remand Redetermination applied § 1677(16)(A), as indicated by the Department's not

allowing an adjustment to normal value to account for the difference in the variable cost of

manufacturing the merchandise ("difmer adjustment") when comparing Union's subject painted

CORE products with the home market laminated CORE products.  Oral Tr. 49-50 (July 16,

2010).[1]  Based on the above-quoted parenthetical and the clarification provided by defendant's

---

[1] At oral argument, the following discussion relevant to this issue took place:
The Court: Why didn't you do the difmer? Why didn't they get the benefit of the difmer?
Ms. Burke: Well, like Mr. Mills [counsel for plaintiff Brady W. Mills] explained, we
wouldn't do the difmer when we're in the first part of the statute.
The Court: Are you saying that you're in (a)?

(continued...)

counsel, the court analyzes the issue presented by the Remand Redetermination according to the

§ 1677(16)(A) definition of foreign like product.  Under that definition, the merchandise sold in

the comparison market (here, the home market, Korea) must be "identical in physical

characteristics with" the subject merchandise.  19 U.S.C. § 1677(16)(A).

        In the case the Department cited, *Pesquera Mares Australes Ltda. v. United States*, the

U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") affirmed the Court of

International Trade's decision sustaining the Department's matching of premium grade salmon

with comparison market sales of both premium grade and super-premium grade salmon.  266

F.3d 1372, 1385 (Fed. Cir. 2001).  Affording the Department's statutory construction deference

according to the Supreme Court's analysis in *Chevron U.S.A. Inc. v. Natural Resources Defense

Council, Inc.*, 467 U.S. 837, 842-43 (1984), the Court of Appeals upheld as reasonable the

Department's construing the statutory term "identical in physical characteristics" such that

merchandise should be considered identical despite the existence of minor, commercially

insignificant differences in physical characteristics.  *Id.* at 1383-84 ("Commerce has concluded

that merchandise should be considered to be identical despite the existence of minor differences

in physical characteristics, if those minor differences are not commercially significant.").  The

appellate court then sustained, under the substantial evidence standard, the Department's finding

---

[1](...continued)
Ms. Burke: Yes.
The Court: Where in the remand redetermination does it say that?
Ms. Burke: Well, I don't think it says it per se but I'll – I mean it doesn't explicitly say it
in the way that I think the Court would like it to but I think it can be obviously drawn from
the discussion.
Oral Tr. 49-50 (July 16, 2010).

"that super-premium was not a commercially recognized separate grade of salmon for purposes

of the Japanese salmon import market."  *Id.* at 1384.

In upholding the Department's statutory construction, the opinion in *Pesquera* provides

guidance on the meaning of the statutory term "identical in physical characteristics."

Concluding that dictionary definitions of the word "identical" established two distinct common

usages, the Court of Appeals saw the choice as between construing the term to mean having the

exact same identity or, alternatively, construing the term to mean having such a near similarity or

resemblance as to be essentially equal or interchangeable or having such close resemblance and

such minor differences as to be essentially the same.  *Id.* at 1382-83.  Concluding that a

construction of "identical" according to the latter category of definitions was reasonable, the

Court of Appeals upheld Commerce's construction of the statutory term "identical in physical

characteristics" to mean "that merchandise should be considered to be identical despite the

existence of minor differences in physical characteristics, if those minor differences are not

commercially significant."  *Id.* at 1384.

The Remand Redetermination appears to rely on the same statutory construction of the

term "identical in physical characteristics" that the Court of Appeals affirmed in *Pesquera.  See

Remand Redetermination* 4.  To the extent that the Remand Redetermination does so, the court

defers to the Department's construction.  The court proceeds to consider the question of whether

the Remand Redetermination lawfully compared laminated and non-laminated, painted CORE

products as "identical in physical characteristics" within the meaning of that term as used in

19 U.S.C. § 1677(16)(A) and expounded in *Pesquera*.  Such comparisons are lawful only if

substantial evidence on the record in this case can support a factual determination that the

physical characteristics distinguishing laminated CORE products from the "other painted," *i.e.*,

non-laminated, CORE products to which Commerce compared laminated CORE products are

minor and not commercially significant.  For the reasons discussed below, the court concludes

that substantial evidence does not exist on the record to support such a determination.

A.  The Remand Redetermination Relies on Factual Findings that Have Little, If Any, Probative
    Weight on Whether the Physical Differences Are Minor and Not Commercially Significant

  At the outset of its analysis, the Remand Redetermination states that "[i]n the twelfth

administrative review," *i.e.*, the review previous to the one at issue in this case, "the Department

engaged in a detailed analysis of the sales and cost information submitted by the parties on the

record of that review to support its continued reliance on the model-match methodology

classifying laminated CORE within the painted category."  *Remand Redetermination* 4 (citations

omitted).  With respect to the review at issue here, Commerce states that "[o]n remand in the

thirteenth administrative review, we have now performed a similar analysis on Union Steel's

sales, cost and customer data from the record of the thirteenth administrative review as we did in

the twelfth administrative review" and concludes that "the Department's findings are consistent

for both reviews."  *Id*.  Alluding to the current and the previous review, the Remand

Redetermination states four findings of fact, which it characterizes as common to both reviews,

*id.* at 4-5, and then bases the following determination on those four findings: "Based on the

above findings, the Department determines that there is nothing new on the factual record of the

thirteenth administrative review that would cause us to reach a different conclusion about the

model-match methodology from that made in the twelfth administrative review."  *Id.* at 5.  Those

four findings, even if presumed to be supported by substantial record evidence, are only

minimally probative on the factual issue of whether the physical differences between laminated

CORE products and painted CORE products are minor and not commercially significant.

Commerce found, first, that "[t]he range of prices for laminated CORE products is within

the range of prices for other painted CORE products for both reviews." *Id.* at 4.  Even though

grounded in record evidence, this finding has little or no probativity on the factual issue of

whether laminated CORE products are distinguished from "other painted" CORE products by

only minor and commercially insignificant physical differences.  Commerce did not find that two

otherwise identical CORE products, one of which is painted and the other of which is laminated,

sell at the same or approximately the same price.  The record shows that CORE products,

regardless of whether painted or laminated, are produced and sold in various product

specifications, in a very broad range of prices.  *Id.* attachment 1 ("Model Match Variables"),

attachment 2 ("Final Analysis Memo for Laminated CORE Products").  Setting forth price data

in broad ranges is not informative on the question of what price difference may exist, typically or

on average, between laminated and non-laminated, painted CORE products that do not differ

except with respect to the presence of paint as opposed to laminate.  Other evidence of record,

however, bears directly on that question.  *See Letter from Union to the Sec'y of Commerce* 6

(Nov. 20, 2006) (Admin. R. Doc. No. 3944) ("*Union's Questionnaire Resp.*") ("Laminating the

steel increases . . . the sales price by" a significant percentage over painted products.).

The second finding stated in the Remand Redetermination is that "[t]he prices for

laminated CORE products are identical to prices for other painted CORE products at a greater

frequency in the thirteenth administrative review than in the twelfth administrative review."

*Remand Redetermination* 4.  This finding, as stated in the Remand Redetermination, has little if

any probative weight for the issue Commerce was required to resolve.  It is simply a comparison

with prior-review data, the significance of which is not explained.

Third, the Remand Redetermination states that "[a] comparable number of customers

purchased both laminated CORE products and other painted CORE products from Union Steel in

the twelfth administrative review and thirteenth administrative review."  *Id.*  This finding has

little relevance to the issue Commerce was required to consider.  Regardless of whether a

purchaser is a distributor or a manufacturer, the fact that the same customer purchased Union's

laminated CORE products as well as Union's non-laminated, painted CORE products does not

signify that the customer considered the physical differences in the two products to be minor and

commercially insignificant.  A distributor may distribute various CORE products, as well as

other steel products, and a manufacturer may purchase different CORE products for different

applications.  Finally, the comparison the Department makes to the corresponding data in the

twelfth review, which is not at issue in this case, does not lend significance to the findings

Commerce made in the thirteenth review.

The fourth stated finding is that "[t]he total cost of manufacture for laminated CORE

products is within the range of the total cost of manufacture for other painted CORE products for

both reviews."  *Id.* at 5.  Commerce approached the question of a differential in manufacturing

costs by examining and comparing broad ranges of manufacturing costs for all types of painted

and laminated CORE products.  Here also, evidence based on broad ranges has little or no

probativity on the issue of whether the two groups of products are distinguished only by minor

and commercially insignificant physical differences.  Because the record demonstrates that both

painting and laminating are conducted on the same types of substrates, more probative evidence

would address the question of whether the cost of laminating is equivalent to the cost of painting.

Union stated in its response to the Department's questionnaire that its laminating process, on

average, costs significantly more to perform than does painting.  *Union's Questionnaire Resp.* 6.

In its supplemental questionnaire response, Union stated that "[b]ecause PET film and PVC film

are more expensive than the various paints used for other color coated products, including

PVDF, and require more complicated processing know-how, the production cost and sales price

are higher than other painted products."  *Letter from Union to the Sec'y of Commerce* 20 (Feb. 2,

2007) (Admin. R. Doc. No. 4036) ("*Union's Supplemental Questionnaire Resp.*").  It appears

that Commerce declined to consider this evidence that laminated CORE products cost more to

produce than painted CORE products.  Observing in the Remand Redetermination that "Union

proposes to isolate only the costs associated with the differences between laminate versus paint,"

Commerce dismisses this inquiry by concluding that "[a]s stated above, in the context of our

model-match analysis, we look at these products from an overall perspective."  *Remand

Redetermination* 9.  Commerce reasoned that "[a]ny analysis performed in calculating margins

will not be limited to cost differences associated with this one small part of the overall

manufacturing process and cost buildup" and gave as an example that it uses total cost of

production in determining whether sales are made below cost.  *Id.*  The court disagrees with this

reasoning.  Evidence that laminating a particular CORE product costs more than painting that

same CORE product is relevant to the question of whether the physical differences between

laminated and non-laminated, painted CORE products are minor and commercially insignificant.

Comparing the total cost of producing a laminated CORE product to the total cost of producing a

non-laminated, painted CORE product is relevant to that question only if the two products are

identical except with respect to the coating, *i.e.* paint or laminate.  Were the physical differences

between laminated and non-laminated, painted CORE products to have no significance in the

marketplace, and were laminating more costly to perform than painting, it would be irrational for

a manufacturer, absent an unusual circumstance, to produce laminated CORE products.[2]

 Even if two hypothetical products cost the same to produce and to buy, it would not

necessarily follow that the two products are "identical" for purposes of 19 U.S.C. § 1677(16)(A).

Customers still might view the two products as different in a commercial sense.  Regardless of

relative cost of production, two products that have physical differences that are not minor and

commercially insignificant but are approximately equal in commercial value may be compared,

in some circumstances, under subparagraph (B) of 19 U.S.C. § 1677(16).  In contrast,

subparagraph (A) requires that the two products, even if costing the same to buy or produce, be

"identical in *physical* characteristics."  19 U.S.C. § 1677(16)(A) (emphasis added); *see*

*Pesquera*, 266 F.3d at 1383-84.  Therefore, price and production cost are relevant to, but not

determinative of, the issue of whether a physical difference has commercial significance.  The

Department's findings as to price and cost, being based on comparisons of broad price and cost

ranges, fail to support even a conclusion that otherwise-identical laminated and non-laminated,

painted CORE products sell for the same price and have the same cost of manufacture.  As

discussed above, the remaining finding, that the same customers purchased both laminated and

other painted CORE products from Union, also lacks probativity on the critical issue in this case.

---

 [2] A circumstance could be envisioned, for example, in which a material shortage required
resort to a different, and much more expensive, process in order to allow production of a
commercially equivalent product; another example is a more expensive process that does not
result in a commercially-significant physical difference but is necessary because a producer lacks
a necessary patent to perform the less expensive process.  The record in this case presents no
evidence of any such unusual circumstance.

These four findings, individually and in aggregate, therefore offer little, if any, support for an ultimate finding that the physical differences in question are minor and not commercially significant.

Although basing its overall conclusion on the four findings discussed above, the Remand Redetermination includes some additional findings.  Commerce states that "there are physical differences that exist within each of the 'other painted products.'"  *Remand Redetermination* 5.  However, the question of whether physical differences between some painted CORE products and other painted CORE products would preclude a proper identical merchandise finding under § 1677(16)(A) is not before the court in this case.  The Department's grouping as "identical" all painted CORE products except for PVDF-painted CORE products may or may not be lawful, but in this litigation, Union does not challenge as overly broad the scope of the "other painted" type category, except to claim that the type category does not properly include laminated CORE products.  A finding that various physical differences exist among the grouped painted CORE products does not indicate or suggest that the physical differences separating laminated CORE products from any non-laminated, painted CORE product–differences that Commerce itself acknowledges to exist–are minor and not commercially significant.

Similarly, with respect to "the differences between laminated and other painted CORE products articulated by Union," Commerce further states that "[w]e found that there were differences in physical characteristics, end uses, costs and selling prices across all of these products."  *Id.*  Summarizing record data, the Remand Redetermination states that "[t]hus, the record shows many differences and similarities between laminated and other CORE products, just as there are among and between all products."  *Id.* at 6.  Because, as the record evidence

demonstrates, both laminated and non-laminated, painted CORE products are made to various

specifications, the model-match methodology groups into the various type categories products

that have some physical variations.  That the model-match methodology, properly or not, made

§ 1677(16)(A) comparisons not at issue here, involving CORE products within the same type

category that have different physical characteristics and end uses, does not justify the specific

decision before the court, which was to compare as "identical" laminated CORE products and

non-laminated, painted CORE products.

      For the reasons the court has discussed, the various factual findings discussed above have

little, if any, probative weight on the issue of whether laminated CORE products and the other

CORE products that Commerce found identical to laminated CORE products are distinguished

by only minor physical differences that are not commercially significant.

      <u>B.  The Department's Determination that Laminated CORE Products Are Not "Marketed
Separately" from Other CORE Products Is Unsupported by Substantial Record Evidence</u>

      In addressing the issue of whether the physical differences distinguishing laminated

CORE products from the other CORE products which the model-match methodology considered,

under 19 U.S.C. § 1677(16)(A), to be "identical" to laminated CORE products have commercial

significance, the Remand Redetermination relies on another finding that lacks probativity.

Specifically, the Department finds that "laminated products are included with painted and other

products in the same product brochure, which is used by the company to market their products to

customers."  *Id.*  From that finding, the Department reaches the unwarranted conclusion that "[i]f

laminated CORE were such a different or unique product as claimed by Union Steel, the

Department might reasonably expect to see record evidence that laminated CORE is marketed

separately" and determines that "[t]he record evidence, however, supports the opposite

conclusion." *Id.* The only evidence on which Commerce relies expressly for that factual

determination consists of a Union brochure and a brochure of its affiliate, Union Coating Co.,

Ltd ("Unico"). *See Letter from Union to the Sec'y of Commerce* exhibit A-28, at 552-607

(Nov. 13, 2006) (Admin. R. Doc. No. 3933) ("*Union's Section A Resp.*"). Those brochures, and

others on the record, do not amount to substantial evidence that laminated CORE products are

not marketed separately from other CORE products. Instead, the brochures, as well as other

evidence of record consisting of Union's questionnaire responses, refute such a finding.

The inclusion of different products in a company's brochure does not, by itself, mean that

the physical differences between those products are minor and not commercially significant.

Commerce had no factual basis on which to assume that a manufacturer would never choose to

describe commercially different products in the same brochure. What is meaningful instead is

the information the product brochures contain about the physical differences between laminated

CORE products and non-laminated, painted CORE products.

Although the record contains a Union brochure and a Unico brochure that describe both

laminated and non-laminated, painted CORE products, the texts of these brochures differentiate

between the two groups of products. The record describes three lines of PET-film laminated

CORE marketed by Union, "Unipet," "Unilux," and "White Board," each of which is listed on

the page of Union's brochure labeled "High-tech Steel"[3] and not on the page labeled "Pre-

---

[3] Contrary to Union's statements in a questionnaire response, "Univure," a Union brand also listed on the "High-tech Steel" page of Union's brochure, does not appear to be laminated CORE. *See Letter from Union to the Sec'y of Commerce* exhibit A-28, at 576 (Nov. 13, 2006) (Admin. R. Doc. No. 3933) ("*Union's Section A Resp.*") Union stated that Univure is one of its "brand-name laminated products" but also stated that its laminated products are coated with polyethylene terephthalate ("PET") film. *Letter from Union to the Sec'y of Commerce* 18 (Feb. 2, 2007) (Admin. R. Doc. No. 4036) ("*Union's Supplemental Questionnaire Resp.*"). Univire is
(continued...)

painted Steel." *Id.* exhibit A-28, at 575-76.  The record also contains a separate brochure for

Unipet, which is described as "a laminated steel sheet with the printed PET (Polyethylene

Telephthalaid [sic]) film on primer-coated galvanized steel sheet." *Union's Supplemental*

*Questionnaire Resp.* exhibit B-22.  Even though, as Union acknowledges, Unico "do[es] not

have a separate product brochure for laminated products," the record shows that Unico has two

brands consisting of only laminated CORE products, "Bristar" and "Natulami."[4]  *Id.* at 18 &

exhibit B-22.  Specifically, excerpts from material that appeared on Unico's website describe

Bristar and Natulami as "LAMINATED Steel Plate."  *Id.* exhibit B-22.  A Unico brochure

indicates under a "Product Characteristics" heading that Bristar and Natulami are coated with

either PVC or a combination of PVC and PET, while Unico's non-laminated, painted CORE

products are not.  *Union's Section A Resp.* exhibit A-28, at 595-603.

  The brochures on the record do not constitute substantial evidence for the Department's

finding that laminated CORE products are not marketed separately from other CORE products.

Together with other record evidence, the brochures establish, to the contrary, that Union

produces and markets separate product lines of PET-film-laminated CORE products, *i.e.*, the

Unipet, Unilux, and White Board lines of products.  *Id.* exhibit A-28, at 576.  The record also

shows that Union's affiliate, Unico, markets two lines of CORE products, Bristar and Natulami,

------

[3](...continued)
not described in any product brochure as being coated with a plastic film such as PET and
therefore does not appear to be a laminated product. *See Union's Section A Resp.* exhibit A-28,
at 576 (describing Univure as having a "[l]ayer of patterns printed on the steel surface by
removing the laminated printed film with various patterns."); *Union's Supplemental
Questionnaire Resp.* exhibit B-22.

  [4] Some record evidence refers to "Naturami" instead of "Natulami." *Union's
Supplemental Questionnaire Resp.* 18 & exhibit B-22.

laminated with either PVC film or a combination of PVC film and PET film.  *See, e.g.*, *Union's Section A Resp.* exhibit A-28, at 594.  The court, therefore, concludes that the record evidence does not sustain Commerce's finding that these products are not "marketed separately."

C.  The Record on the Whole Does Not Contain Substantial Evidence Establishing that the
Physical Differences in Question Are Minor and Commercially Insignificant

Despite its apparent reliance on the statutory construction affirmed in *Pesquera*, the Remand Redetermination does not contain a finding that the two groups of products in question are, in a commercial sense, essentially equal or interchangeable.  This omission is noteworthy, for two reasons.  First, language in the *Pesquera* opinion suggests that physical differences are minor and commercially insignificant if the two products under consideration can be described as "essentially equal or interchangeable."  *Pesquera*, 266 F.3d at 1382 (quoting *The American Heritage Dictionary* 639 (2d ed. 1991)).  Second, as a matter of logic, it is difficult to envision how the physical differences separating the two groups of products at issue in this case could be considered to be minor and commercially insignificant unless the two groups of products are viewed by customers as generally equal or interchangeable in the marketplace.  The court is unable to find on the record substantial evidence to support a finding that the two product groups are viewed in this way, and what evidence exists is inconsistent with such a finding. *Cf. Pesquera*, 266 F.3d at 1378 (describing the Department's findings that in various countries the highest grade of salmon was the "superior" grade, which Commerce found equivalent to the Japanese "premium" grade, and that superior grade salmon would contain some salmon that, like "super-premium" grade salmon, would be without defects).

The Remand Redetermination reaches an overall finding that "although we agree that there are certain physical differences between laminated and other painted products, we disagree

that these differences result in a significant commercial difference that would render the products *non-comparable*." *Remand Redetermination* 5 (emphasis added).  This formulation of a factual determination is conclusory.  It fails to address the central issue that Commerce was required to resolve on remand.  Two groups of products that are not "identical" might not, for purposes of identification of the foreign like product, necessarily be "non-comparable" under 19 U.S.C. § 1677(16)(B) or (C).  However, when proceeding under § 1677(16)(A), as opposed to § 1677(16)(B) or (C), Commerce is held to the "identical" standard, under which differences in physical characteristics in the two groups of products being compared may exist, but if they exist, these differences must be minor and not commercially significant.  In this case, Commerce insisted on matching as "identical," according to § 1677(16)(A), Union's sales of non-laminated, painted CORE products in the United States with sales in Korea that included both laminated and non-laminated, painted CORE products.  All but one of the findings of fact that the Department made to support that determination had little, if any, probative weight on the issue of the commercial significance of the physical differences.  The finding of fact that laminated CORE products are not "marketed separately" from non-laminated, painted CORE products, although it is vaguely expressed, arguably would have had some probativity with respect to that issue.  However, that finding is unsupported by substantial record evidence and, instead, is contradicted by the evidence consisting of the brochures and questionnaire responses.

        After reviewing the record as whole, the court concludes that record evidence consisting of the brochures, the questionnaire responses, and Union's reported price and cost data does not constitute substantial evidence to support a finding that the physical differences between laminated and non-laminated, painted CORE products are minor and not commercially

significant.  The brochures and questionnaire responses establish that laminated and non-

laminated, painted CORE products result from different coating processes and are comprised of

different materials.  *See, e.g.*, *Union's Section A Resp.* exhibit A-28, at 576, 591-93; *Union's*

*Questionnaire Resp.* 5-6.  According to a questionnaire response, these differences gave

laminated CORE products different physical characteristics from those of the non-laminated,

painted CORE products.  Union stated in the questionnaire response that "[c]ompared to the

normal painted products, laminated products have physical properties such as unrestricted

expression of various patterns, superior durability, environmentally-friendly material, etc."

*Union's Questionnaire Resp.* 6; *see also Union's Section A Resp.* exhibit A-28, at 576.

According to another questionnaire response, the different physical characteristics are significant

to Union's customers.  Union stated that its "salesmen work with their customers to make sure

that they obtain the right product for their needs" and that "[s]hould that need best be served with

a laminated product, Union would sell the laminated product to the customer."  *Union's*

*Supplemental Questionnaire Resp.* 22.

        A finding that the physical characteristics that distinguish laminated CORE products

have no commercial significance must confront the record evidence showing that Union and

Unico have invested in production equipment and other resources necessary to produce and

market laminated CORE products while concurrently producing and marketing non-laminated,

painted CORE products.  The product brochures and questionnaire responses establish that

Union produces three separate lines of PET-film-laminated CORE products and that its affiliate,

Unico, produces two separate lines of CORE products laminated with either PVC film or a

combination of PVC film and PET film.  In sum, the record evidence refutes a finding that the

physical differences between laminated and non-laminated, painted CORE products are minor

and not commercially significant.

Defendant-intervenor United States Steel Corporation ("U.S. Steel") argues that the

record supports a finding that the physical differences between laminated and non-laminated,

painted CORE products are minor because Unico's brochure shows that both groups of products

"are used for the exact same purposes."  U.S. Steel's Remand Comments 11.  U.S. Steel's

contention is unwarranted by the record evidence.  Unico's brochure shows that laminated

CORE products share many applications with certain non-laminated, painted CORE products,

*e.g.*, the outer casings on home appliances such as refrigerators and microwaves and applications

as interior building materials.  *Union's Section A Resp.* exhibit A-28, 595, 597, 599, 601, 603.

Neither this brochure nor other record evidence shows, however, that customers perceive no

significant differences between these two groups of products.  To the contrary, the record

contains evidence that Union's sales personnel recommend laminated CORE products to satisfy

the requirements of certain customers, *Union's Supplemental Questionnaire Resp.* 22, and that

laminated CORE products are more durable than non-laminated, painted CORE products,

*Union's Questionnaire Resp.* 6.

Defendant and defendant-intervenors also argue that the physical differences between

laminated and non-laminated, painted CORE products were minor and not commercially

significant because laminated products were not typically more expensive to produce than non-

laminated, painted CORE products.  *See, e.g.*, Def.'s Post-Oral Argument Resp. 6.  The evidence

does not support how these parties characterize the costs of production, and their

characterization would have little probative weight in any case.  The evidence shows that

typically, but not invariably, laminated CORE products were more expensive to produce than

non-laminated, painted CORE products: in a comparison of thirty-nine sets of otherwise

identical CORE products, laminated products were more expensive to produce than non-

laminated, painted CORE products in thirty-four instances.  Pl.'s Post-Oral Argument Comments

9 n.5 & attachment 1.  As discussed previously, even if the evidence showed that production

costs were not typically different, such evidence would not be determinative on the question of

whether the two groups of products are distinguished only by physical differences that are minor

and not commercially significant.

      Defendant and defendant-intervenors attempt to discredit the data showing that the

weighted-average cost to produce laminated CORE products substantially exceeded the

weighted-average cost to produce non-laminated, painted CORE products, *Union's*

*Supplemental Questionnaire Resp.* exhibit B-24, contending that, because the products within

both groups have substantially different costs of production, a weighted-average reflects only the

relative cost to produce the mix of products sold during the period of review.  *See, e.g.*, Def.'s

Post-Oral Argument Resp. 9.  Regardless of the limits inherent in weighted averages, this

argument is unconvincing.  Again, the record as a whole fails to support a finding that otherwise

identical laminated CORE products and non-laminated, painted CORE products cost the same to

produce.  *See* Pl.'s Post-Oral Argument Comments 9 n.5 & attachment 1 (showing that, for

thirty-four of thirty-nine sets of otherwise identical products, the laminated product were more

expensive to produce); *Union's Questionnaire Resp.* 6 (indicating that lamination increases the

total cost of manufacture).

Defendant-intervenor Nucor Corporation argues that the evident difference in the costs of

producing these groups of products is not relevant because it is mostly due to savings from

economies of scale associated with the far greater production of non-laminated, painted CORE.

Nucor's Post-Oral Argument Comments 6-11.  This contention appears to be based on an

unsupported assumption concerning economies of scale, but even taken at face value the

contention acknowledges that laminated CORE products cost more to produce than non-

laminated, painted CORE products.

Defendant-intervenor U.S. Steel argues that the record evidence demonstrates no

"significant" differences between the costs to produce laminated and non-laminated, painted

CORE products because (1) raw materials costs were in the same range, with different varieties

of both groups of products having low, median, and high production costs, (2) the differences in

the costs of paint and laminate are not substantial, and (3) with respect to Unico, the overhead

expenses associated with non-laminated, painted CORE products are greater than the overhead

expenses associated with laminated CORE products.  U.S. Steel's Post-Oral Argument

Resp. 4-11.  The evidence on which these arguments rely fails to show that laminated CORE

products were not typically more expensive to produce than non-laminated, painted CORE

products.  First, evidence that costs were in similar ranges and were concentrated at similar

levels says little about whether production costs for laminated and non-laminated, painted CORE

products were typically similar because both laminated and non-laminated CORE products were

produced in various sizes and specifications.  *Remand Redetermination* attachment 1 ("Model

Match Variables"), attachment 2 ("Final Analysis Memo for Laminated CORE Products").

Second, U.S. Steel's statement that the costs of paint and laminate are similar is not supported by

the record, which shows that most of Union's paints cost less than PET film or PVC film.  *See*

*Letter from Union to the Sec'y of Commerce* exhibit D-43, at 27 (Mar. 2, 2007) (Admin. R. Doc.

No. 4066).  Third, U.S. Steel's argument about overhead costs is unpersuasive because overhead

is only one component of Unico's manufacturing cost, and Unico's total per-unit cost of

manufacture for laminated CORE products is greater than its total per-unit cost of manufacture

for non-laminated, painted CORE products.  *See Union's Supplemental Questionnaire Resp.*

exhibit B-24.

 For the various reasons discussed above, the court concludes that the record as a whole

does not contain substantial evidence that the physical differences separating laminated CORE

products and non-laminated, painted CORE products are minor and not commercially

significant.  Therefore, it was unlawful for Commerce to compare these groups of products as

"identical" according to 19 U.S.C. § 1677(16)(A).

 D.  The Department's Claimed Reliance on a Practice Not to Alter a Model-Match Methodology
   Absent Compelling Reasons Does Not Suffice to Sustain the Remand Redetermination

 The Remand Redetermination relies on a claimed "practice . . . not to alter a model-

match methodology developed at an earlier stage of a proceeding absent 'compelling reasons' for

the modification."  *Remand Redetermination* 4.  In support of this reliance, the Remand

Redetermination cites various decisions of the Court of International Trade for the proposition

that the practice is grounded in a reasonable construction of the antidumping statute.  *Id.* (citing

*Fagersta Stainless AB v. United States*, 32 CIT __, 577 F. Supp. 2d 1270 (2008); *SKF USA Inc.*

*v. United States*, 31 CIT 951, 491 F. Supp. 2d 1354 (2007), *aff'd* 537 F.3d 1373 (Fed. Cir. 2008)

and *Mittal Steel USA, Inc. v. United States*, 31 CIT 1395 (2007)).  After making various factual

findings, the Remand Redetermination states as follows: "[t]he Department finds on remand that

the record evidence does not support the assertion that meaningful physical and commercial

differences between laminated and other painted CORE products justify a departure from its

previous model match methodology." *Id*. at 10.

The prior decisions of the Court of International Trade cited in the Remand

Redetermination are not binding on the court in this case.  More important, however, is that

those prior decisions do not state a principle under which the court may affirm the Remand

Redetermination.  None of the cited cases hold that the Department is free to do what it did here,

which was to refuse, under a "compelling reasons" standard, to modify a model-match

methodology on a record that does not permit the Department to find that laminated and "other

painted" CORE products are "identical in physical characteristics" as required by 19 U.S.C.

§ 1677(16)(A).  Whatever the merits of its claimed practice, the Department cannot comply with

the definition of "foreign like product" in § 1677(16)(A) unless it can find, based on substantial

evidence, that the physical differences involved are minor and not commercially significant.  The

analysis undertaken by the Court of Appeals in *Pesquera* confirms this point.  *Pesquera*, 266

F.3d at 1384 (stating, after affirming the Department's construction of the statute, that "[w]e

must also determine whether Commerce's commercial practice determination here is supported

by substantial evidence and whether Commerce has provided an adequate explanation for its

determination.").  In the circumstances of this case, the fact that Commerce is applying a model-

match methodology that it used in prior reviews is insufficient to justify a determination that

lacks such a valid finding.  The cases the Remand Redetermination cites do not hold to the

contrary.

In *Fagersta*, a factual issue critical to the challenge to the model-match methodology was whether stainless steel wire rod ("SSWR") made using a process of electro-slag refining, which plaintiff Fagersta Stainless AB defined as "a separate and significant processing stage . . . [that] imparts unique material qualities, primarily superior fatigue resistance, to the finished wire rod product," *Fagersta*, 32 CIT at __, 577 F. Supp. 2d at 1274 (alterations in original), differed physically from other SSWR in a way that was commercially significant, *id.* at __, 577 F. Supp. 2d at 1278-79.  Basing its decision on the record evidence, the Court of International Trade sustained the Department's finding that the physical difference was not commercially significant. *Id.* at __, 577 F. Supp. 2d at 1279-80.  In contrast, the record in this case will not support such a finding.

*SKF USA* did not address the narrow issue presented by this case.  In *SKF USA*, the Court of International Trade upheld the Department's decision to revise the long-standing "family" methodology for matching various models of ball bearings in favor of a new methodology that involved, *inter alia*, a difmer adjustment.  *See SKF USA*, 31 CIT at 953-60, 491 F. Supp. 2d at 1358-63.  The case did not involve a decision to modify, or refuse to modify, a model-match methodology that was grounded solely in the "identical in physical characteristics" criterion of 19 U.S.C. § 1677(16)(A).

*Mittal* does not stand for a principle under which the court may uphold the Remand Redetermination.  Although *Mittal* involved the model-match methodology applied to CORE products from Korea, the question presented was whether the Department acted lawfully in rejecting a request of the petitioner to require respondents to provide more specific product information in a supplemental questionnaire, on the premise that had these data been collected,

petitioners possibly would have been able to uncover a compelling reason for changing the

model-match methodology.  *Mittal*, 31 CIT at 1397-98.  The Court of International Trade

upheld, as supported by substantial record evidence, the Department's decision not to request the

additional information.  *Id.* at 1400.

In conclusion, the judicial decisions on which the Remand Redetermination relies do not

support a principle under which the decision challenged here can be sustained.  The existence of

a practice of declining to modify an existing model-match methodology absent "compelling

reasons" does not suffice to support unlawful comparisons under 19 U.S.C. § 1677(16)(A).  That

the record fails to support, with substantial evidence, a finding that the merchandise being

compared is in fact "identical in physical characteristics" within the meaning of that provision

must be viewed, in the context of this case, as a "compelling reason" to change the model-match

methodology to bring that methodology into compliance with law.

### III.  Conclusion

The Remand Redetermination must be set aside as contrary to law.  The current record

does not contain substantial evidence to support a determination that laminated CORE products

may be compared with "other painted," *i.e.*, non-laminated, painted CORE products under the

"identical in physical characteristics" requirement of the foreign like product definition in

19 U.S.C. § 1677(16)(A).  Therefore, Commerce, on the second remand, may not compare

laminated CORE and non-laminated, painted CORE products under § 1677(16)(A) unless it

reopens the record, conducts a sufficient investigation on the question of whether the physical

differences distinguishing laminated and non-laminated, painted CORE products are minor and

not commercially significant, and reaches appropriate, probative findings that are supported by

substantial evidence on the reopened record.  If Commerce decides not to proceed in this way, on

the second remand it must modify the model-match methodology applied in the Final Results to

avoid comparing laminated CORE and non-laminated, painted CORE as products "identical in

physical characteristics" under § 1677(16)(A).

### <u>ORDER</u>

Upon consideration of all proceedings and submissions herein, and upon due

deliberation, it is hereby

**ORDERED** that the *Final Results of Redetermination Pursuant to Remand* (Dec. 28, 2009) ("Remand Redetermination") be, and hereby are, set aside as contrary to law; it is further

**ORDERED** that Commerce, upon remand, shall review and reconsider its "model-match" methodology, including its decision, made in *Certain Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Notice of Final Results of the Thirteenth Admin. Review*, 73 Fed. Reg. 14,220 (Mar. 17, 2008) ("Final Results"), and made again in the Remand Redetermination, to deny Union's request for a revision of that model-match methodology, by which Commerce compared the types of subject merchandise in plaintiff's U.S. sales with the types of foreign like products in plaintiff's sales in its home market; it is further

**ORDERED** that, on remand, the Department may reopen the record to re-investigate the question of whether the physical differences that have been established to exist between laminated and non-laminated, painted CORE products are minor and commercially insignificant; it is further

**ORDERED** that if Commerce does not reopen the record to re-investigate the question of whether the physical differences that have been established to exist between laminated and non-laminated, painted CORE products are minor and commercially insignificant, then it must alter the model-match methodology that was applied in the Final Results and Remand Redetermination so that laminated and non-laminated, painted CORE products are not compared according to 19 U.S.C. § 1677(16)(A) and recalculate Union's margin accordingly; it is further

**ORDERED** that the second redetermination must comply in all respects with this Opinion and Order, be supported by substantial evidence, and be otherwise in accordance with law; and it is further

**Court No. 08-00101**                                                      **Page 30**

     **ORDERED** that the Department shall have ninety (90) days from the date of this Opinion and Order to file its second redetermination upon remand in this proceeding, that plaintiff and defendant-intervenors shall have thirty (30) days from the filing of the second redetermination upon remand to file comments thereon with the court, and that defendant shall have fifteen (15) days thereafter to file any reply to such comments.


                                       /s/ Timothy C. Stanceu
                                       Timothy C. Stanceu
                                       Judge


Dated: January 11, 2011
        New York, New York